# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

UNITED STATES OF AMERICA

v.                                                                           CRIMINAL ACTION NO. 3:09-00050

CHRISTOPHER J. JACKSON

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant Christopher Jackson's Motion to Suppress. On November 2, 2009, the Court held a hearing on the motion and ordered additional briefing on the issues presented. As the additional briefing is now complete, the Court finds the motion ripe for decision. Upon consideration of the motion, the Court **GRANTS** the defendant's motion.

## I.
## FACTS

On May 18, 2008, the Wayne County Sheriff's Department was conducting a sobriety checkpoint at the intersection of U.S. Route 52 and Route 75 in the Kenova area of Wayne County, West Virginia. At approximately 12:55 a.m., Chris Fedczak approached the checkpoint at a high rate of speed. Corporal Stafford Poff of the Wayne County Sheriff's Department spoke with Mr. Fedczak. According to Corporal Poff, Mr. Fedczak, who appeared very angry and agitated, told him that he was the owner of the nearby tavern known as the Highway Inn, and he was on his way to the establishment because a robbery had "just occurred" there. (Tr. at 4 & 5, Nov. 2, 2009.) From the conversation, Corporal Poff believed the police were not yet on the scene, and Mr. Fedczak seemed upset that they were doing the sobriety checkpoint instead of going to the Highway Inn to investigate. The Highway Inn was approximately 6 to 8 miles from the checkpoint and within the

Huntington city limits. Mr. Fedczak also stated the robbers were a white female and black male and they were armed with a handgun. Corporal Poff phoned the 911 dispatcher who verified the establishment was robbed at gunpoint and the suspects were a white female and black male.

Corporal Poff told the other officers at the checkpoint about the information. At that time, Deputy Mounts reported to him that a white female and a black male had just driven through the checkpoint going south on Route 52 in a silver Ford Focus. Corporal Poff immediately got in his cruiser and began driving in that direction. Approximately 3 miles south of the checkpoint, Corporal Poff noticed a silver vehicle, which he believed to be a Volkswagon Jetta, parked on the side of the road near the Docks Creek Road intersection. He also observed only one person in the vehicle so he continued down the road without investigating the parked car. Corporal Poff stated he did not make it very far when he was notified by deputies at the checkpoint that the silver Ford Focus with the white female and black male had returned. Corporal Poff said it took him about five to eight minutes to return to the checkpoint and that the car which had been parked near Docks Creek was gone and he did not recall passing it or seeing it anywhere when he drove back to the checkpoint.

According to the Government, before Corporal Poff arrived, Deputy Varney approached the vehicle and asked the occupants for identification. The female stated her name was Andrea Gilman and gave the officer her driver's license. The male identified himself as Christopher Jackson, but he said he did not have any identification with him.

When Corporal Poff returned, the officers on the scene handed Corporal Poff Ms. Gilman's driver license and proof of insurance. Corporal Poff explained to Ms. Gilman that they were stopped because they matched the description of two armed robbery suspects in a "be on the lookout for" (BOLO) notice. Corporal Poff asked Ms. Gilman and the defendant to get out of the car, and they were searched for officer safety. Ms. Gilman and the defendant were then separated, placed in different police cruisers, and given their Miranda warnings. Corporal Poff then spoke to Ms. Gilman.

Ms. Gilman told Corporal Poff that she was driving a rental car because her personal car had been repaired recently and she wanted to drive a dependable vehicle to drive to Mingo County. Corporal Poff stated she acted nervous and he found her explanation suspicious. Corporal Poff then asked Ms. Gilman if he could search the vehicle. He said Ms. Gilman was reluctant to give permission so he explained the details of the crime and why they were stopped. He said if they were innocent, she should let him search the vehicle and then they could go on their way. He further said that, if she did not give permission, he would attempt to get a warrant because a very serious crime involving a firearm had been committed. At that point, Ms. Gilman relented and consented to the search.

Before Corporal Poff began the search, the defendant motioned for him to come over to the cruiser in which he was seated. The defendant then told him that there was a firearm underneath the driver's side seat and that Ms. Gilman had nothing to do with it. The vehicle was

then searched and a Taurus .357 magnum revolver loaded with six rounds of hollow point ammunition was found underneath the driver's side seat.[1]

After the search, Officer Poff contacted 911 to check for outstanding warrants and was informed that the defendant had a felony warrant in Mingo County. The defendant was arrested. At 1:44 a.m., it appears that the Huntington Police Department, which was investigating the robbery, was in route to the checkpoint. Corporal Poff stated that the search occurred before the Huntington Police Department arrived.

What Corporal Poff did not know at the time Ms. Gilman and the defendant were stopped, questioned, and searched, is that the robbery actually took place over an hour before Mr. Fedczak came through the checkpoint. The first call to 911 about the robbery occurred at 11:45 p.m. The caller told 911 she could not really see the robbers because they were covered from head to toe and had bandannas, but she estimated the height of the male as 6' to 6' 1" and his weight to be approximately 175 to 180 pounds. There also was a mention of the male wearing an evil Satan mask. With respect to the female, she was estimated to be 5' 7" to 5' 8", approximately 125 pounds,

---

[1] Officers also found a black-handled Smith & Wesson knife, a pill bottle with black tape around it with cocaine residue, a black bandanna, black Phat Farm jogging pants, black and gray Air Jordan shorts, a blue hooded sweatshirt and a blue Ocean bandanna, and a pair of size ten and a half brown Timberland boots. Corporal Poff stated that the clothes were located in the hatchback of the vehicle and they were wet, which he also found suspicious. The defendant also had $318 on his person. Corporal Poff asked the defendant how he got the money, but the defendant did not explain. Officers also found $163 in Ms. Gilman's purse and a digital camera. Corporal Poff viewed the pictures on the camera. Some of those pictures were of the defendant with the .357 magnum found in the vehicle and of the defendant with other black males holding rifles. None of this information figures in the decision as it was all gathered after the gun was discovered.

and wore a scream mask. To the contrary, Corporal Poff wrote that the defendant in this case was 5' 7" and 210 pounds and Ms. Gilman was 5' 5" and weighed 150 pounds.

Ms. Gilman also testified at the motion hearing. Ms. Gilman said she was currently a graduate student at Marshall University and had known the defendant since high school. She said she rented the car because her car had work done on it and she wanted a stable car to drive. She stated that she and the defendant were headed south toward Williamson when they first encountered the checkpoint. After she got through the checkpoint, she realized she was low on gas and there was a gas station right before the checkpoint, so she turned around to get gas. When they got back to the checkpoint, they were stopped because of the BOLO. She said they separated her from the defendant and she was asked if they could search the car. She agreed only after she was told that they could keep them there all night until they got a search warrant.

## II.
## DISCUSSION

Initially, the defendant concedes that he does not have standing to claim that the consent to search the car was not voluntary. Rather, the defendant asserts he is challenging the legality of the stop. *See Brendlin v. California*, 551 U.S. 249, 251 (2007) (holding that a passenger of a car is seized during a traffic stop and may challenge the constitutionality of the stop). Clearly, the Fourth Amendment protects people from unreasonable search and seizures. The question before the Court in this case is whether the defendant's Fourth Amendment rights were violated during the stop.

In *United States v. Hensley*, 469 U.S. 221 (1985), the United State Supreme Court discussed the parameters of investigatory stops when an individual is a suspect in a completed crime. In *Hensley*, an informant told police that the defendant was involved in an armed robbery. *Id*. at 223. Therefore, the police issued a "wanted flyer" for the defendant. *Id*. Approximately six days later, the defendant was spotted driving a car and was pulled over. *Id*. at 223-24. Although the officers had no confirmation that a warrant had been issued for the defendant's arrest, he and his passenger were ordered to get out of the vehicle at gun point. *Id*. at 224. Another officer who arrived on the scene recognized the passenger as a convicted felon. That officer also saw the butt of a gun sticking out from under the passenger's seat. *Id*. The passenger was arrested, and the car was searched and two more guns were found. The defendant then was arrested. The defendant was indicted federally for being a felon in possession of firearms. The defendant moved to suppress the evidence by arguing he was unconstitutionally stopped. *Id*. at 225.

Upon appeal, the Supreme Court summarized several of its prior opinions as suggesting "that the police are not automatically shorn of authority to stop a suspect in the absence of probable cause merely because the criminal has completed his crime and escaped from the scene." *Id.* at 228. However, the Supreme Court noted that "[t]he precise limits on investigatory stops to investigate past criminal activity are more difficult to define." *Id*. In those instances, courts should apply the Fourth Amendment's principle of reasonableness and "balance[] the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *Id*. (citations omitted).

In applying this test to situations in which the police are investigating prior crimes, the Supreme Court found "that probable cause to arrest need not always be required," but the factors to consider may be slightly different than those applied for stops to investigate ongoing criminal offenses. *Id*. When a crime is ongoing or imminent, the Government has a more direct interest in crime prevention and detection. To the contrary, when a crime already is completed, the Government's interest in crime prevention related directly to the stop becomes more attenuated. In addition, the need for the police to take action to prevent or impede criminal activity is not necessarily pressing long after the crime has been committed. Likewise, concerns over public safety may be lessened once the crime is over and the defendant appears to be going about his lawful business. Lastly, "officers making a stop to investigate past crimes may have a wider range of opportunity to choose the time and circumstances of the stop." *Id*. at 228-29 (citations omitted). However, even when a crime is completed, the government retains a strong interest in solving crimes and promoting justice. In some circumstances, such as when the police encounter a suspect they previously have been unable to locate, the Government's interests may be sufficient to briefly stop the individual, check identification, and ask questions even when probable cause is absent. Those interests are heightened when those crimes involve threats to public safety. Therefore, the Supreme Court concluded that "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry*[2] stop may be made to investigate that suspicion." *Id*. at 229.

---

[2]*Terry v. Ohio*, 392 U.S. 1 (1968).

In applying these criteria to the facts before it, the Supreme Court held "that, if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information." *Id.* at 232 (citations omitted). *Compare Whiteley v. Warden*, 401 U.S. 560, 568 (1971) (holding, in part, an illegal arrest made without probable cause "cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest"). An objective reading of the flyer, however, must support the stop. If so supported, then the Supreme Court held "that the evidence uncovered in the course of the stop is admissible if the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop, and if the stop that in fact occurred was not significantly more intrusive than would have been permitted by the issuing department." *Id.* at 682 (italics original). The Supreme Court continued on to find the "flyer, objectively read and supported by a reasonable suspicion of the part of the issuing department, justified the length and intrusiveness of the stop and detention that actually occurred." *Id.* at 235.

To be clear, when reasonable suspicion exists it still must be balanced against the intrusiveness and scope of the stop. Even when a stop begins as a legitimate, lawful encounter, courts must apply the Fourth Amendment's protective measures when the scope of the stop exceeds the bounds of reasonableness. *See generally Terry*, 392 U.S. at 20 (applying dual inquiry: "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the inference in the first place"). Although there is no precise

formula to make these determinations, courts must consider the totality of the circumstances in each case. *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004) (holding that "[i]n assessing a *Terry* stop's validity, we consider the totality of the circumstances").

Applying this analysis to the present facts, the Court first must determine whether there was reasonable suspicion to stop the car. Initially, the Court notes that, although they were stopped at a sobriety checkpoint, it is undisputed that the reason why this particular vehicle was not permitted to proceed past the checkpoint was because of the BOLO, and not because of any concerns of Ms. Gilman's sobriety or any other traffic infraction. Likewise, once stopped, the Government agrees that Ms. Gilman and the defendant were seized within the meaning of the Fourth Amendment. In considering the totality of the circumstances, this Court has little difficulty finding this initial stop was constitutional. The officers knew there was a recent armed robbery in close proximity to the checkpoint, the suspects were a white female and black male, and they were the only couple fitting that description that had gone through the checkpoint. Although Corporal Poff was mistaken that the robbery had "just occurred," the Court finds that even if he had known it had occurred approximately an hour earlier, it was still sufficiently close in time that it would not prohibit the initial investigatory stop.

Once stopped, the officers on the scene collected Ms. Gilman's driver's license and proof of insurance and waited approximately five to eight minutes for Corporal Poff to return. After he arrived, he explained to Ms. Gilman and the defendant that they fit the racial profile of armed robbers. They were then asked to get out of the car and patted down for officer safety. Although

the duration of the detention is lengthening, the Court finds that a patdown for officer safety was reasonable in that they knew the robbers were armed. *See Arizona v. Johnson*, 129 S. Ct. 781, 787 (2009) (affirming that officers conducting traffic stops may patdown a passenger if there is reasonable suspicion the passenger may be armed and dangerous). However, the officers found nothing unusual or suspicious during the patdown and there was not anything of a suspicious or incriminating nature in plain view in the car. Nevertheless, the officers separated Ms. Gilman and the defendant and put them in the back of different police cruisers and both were given their Miranda rights. Clearly, Ms. Gilman and the defendant remained seized during this entire time as a reasonable person would not have felt like he or she could walk away from the situation.[3]

Corporal Poff then began questioning Ms. Gilman. Although it is unclear exactly how long the actual questioning lasted, the call log from the Wayne County dispatch shows that Ms. Gilman and the defendant were stopped at the checkpoint at 1:07 a.m. and the call log from the Huntington dispatch shows that the Huntington Police Department was called to the scene at 1:44 a.m. after the search had been completed.

---

[3]This case is distinguishable from those cases in which there was a valid *Terry* stop and, after it concluded, there was a valid consent to search. *See, e.g., United States v. Meikle*, 407 F.3d 670, 672 (4th Cir. 2005) (stating that, "if the traffic stop becomes a consensual encounter, the *Terry* inquiry would not be employed . . . because a consensual encounter does not trigger Fourth Amendment scrutiny" (internal quotation marks and citations omitted)); and *United States v. Rusher*, 966 F.2d 868, 876-77 (4th Cir. 1992) (upholding the lower court's decision that the driver of the vehicle gave a voluntary consent to search following valid traffic stop).

During the questioning, Ms. Gilman explained to Corporal Poff that she was driving a rental vehicle because she wanted a better car to drive to Mingo County.[4] Corporal Poff thought her explanation suspicious, and he said she appeared very nervous. He sought permission to search the vehicle, but she was reluctant. Therefore, he again explained the details and severity of the crime and told her that if she did not consent he would attempt to get a search warrant. Ms. Gilman testified he told her that, if she did not consent, they would be there all night while he attempted to obtain a search warrant. After being threatened with a lengthy detention, she agreed to the search.

The Court notes that, after Corporal Poff's initial questioning of Ms. Gilman, he basically had no new information linking her and the defendant to the robbery. Ms. Gilman had given the officers her identifying information and the defendant had given them his name. In addition, nothing was discovered during the patdown, and nothing incriminating was seen in plain view in the car which would have raised the level of suspicion that these individuals were involved in the robbery. Both Ms. Gilman and the defendant appeared to be cooperative and had complied with the officers' requests. Although Corporal Poff said that Ms. Gilman seemed nervous, the Court gives little weight to his observation. Although nervousness can be a factor to consider,[5] Ms. Gilman's nervousness was completely understandable. Just moments before, she and the defendant had traveled through the checkpoint without incident. Now, as she went back through the checkpoint to get to the gas station, she was stopped and was told she and the defendant were armed

---

[4]Mingo County is located approximately 50 miles south of the checkpoint area.

[5]*See Illinois v. Wardlow,* 528 U.S. 119, 124 (2000) (stating "[n]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion").

robbery suspects. She was required to get out of the car, patted down and placed in the back of a police cruiser, then Mirandized, and questioned. Nervousness, under such circumstances, would be normal. Likewise, the Court finds that telling the officer she had a rental car because she wanted a nicer car to drive this occasion does little to raise the degree of reasonable suspicion. There was simply nothing that either Ms. Gilman or the defendant did or said during the initial questioning that may be reasonably considered suspicious or which warranted escalating the nature of the detention.

Moreover, Corporal Poff did not do anything to find out if the 911 dispatcher had any additional information about the robbery suspects which would have linked Ms. Gilman and the defendant to the robbery. Indeed, had he done so, he would have found the contrary to be true. He would have learned that the robbery occurred over an hour earlier than he thought and the height and weight descriptions of the suspects were at odds with the height and weight of Ms. Gilman and the defendant.

The defendant argues that Corporal Poff should be held accountable for knowing the information held by the 911 dispatcher. With such information, the defendant argues that any reasonable suspicion would have evaporated once Corporal Poff saw Ms. Gilman and the defendant. In support, the defendant cites a number of cases in which courts have looked beyond what the officer making the stop or arrest actually knew.[6] The Court agrees with the defendant that such

---

[6]*See, e.g., Whiteley*, 401 U.S. at 568 (holding, in part, that where a complaint serving as the basis of a warrant could not support probable cause and the arresting officer did not possess any information corroborating an informant's tip, the suspect's arrest violated his constitutional rights); *Feathers v. Aey*, 319 F.3d 843, 849 (6th Cir. 2003) (finding "[t]he officers did not know that the
(continued...)

information would have at least diminished the degree of reasonable suspicion that Corporal Poff had that Ms. Gilman and the defendant had committed the robbery and such information should be considered in determining the reasonableness of the detention.

        Despite the fact he had no additional information implicating Ms. Gilman and the defendant in the robbery and evidence to the contrary existed, the detention of Ms. Gilman and the defendant escalated to the point that Corporal Poff threatened that he would keep them there all night if Ms. Gilman did not consent to a search of her car. Although the Court recognizes, as in *Hensley*, that the police have a strong interest in solving crimes and protecting the public, that interest much be balanced against the nature of the detention. Here, the detention continued to escalate despite the fact there was nothing new learned that raised the degree of reasonable suspicion. The Court does not believe that the fact the couple fit the racial profile of the robbers and the stop occurred in some proximity to the time and place of the robbery are sufficient to continue the detention beyond the initial stop, patdown, and a few investigatory questions. After those initial steps were taken and no new information was gleaned that connected Ms. Gilman or the defendant in the robbery, the Court finds that continuing the detention exceeded the Fourth Amendment's

---

[6](...continued)
dispatcher's information was from an anonymous tipster who offered no evidence of reliability, but for purposes of determining whether the *Terry* stop was reasonable, we must impute to the individual officers the dispatcher's knowledge that the tip was anonymous"); *United States v. Fernandez-Castillo*, 324 F.3d 1114, 1118 (9th Cir. 2003) (stating "the dispatcher's knowledge is properly considered as part of our analysis of reasonable suspicion"); and *United States v. Kaplansky*, 42 F.3d 320, 327 (1994) (Appendix per curiam) (holding "where officers are told to investigate a situation without being told all of the facts justifying investigation, the court must look beyond the specific facts known to the officers on the scene to the facts known to the dispatcher").

requirement of reasonableness. Therefore, the Court finds the defendant's Motion to Suppress must be granted.

### III.
### CONCLUSION

Accordingly, for the foregoing reasons, the Court **GRANTS** the defendant's Motion to Suppress.

The Court **DIRECTS** the Clerk to send a copy of this Order to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER: December 23, 2009

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE